Filed 3/21/25  P. v. Torres CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br><br>ADRIAN TORRES,<br><br>        Defendant and Appellant. | A169539<br><br>(Solano County<br>Super. Ct. No. PCF274440) |

Defendant Adrian Torres appeals from an order of the trial court denying his petition for resentencing under Penal Code section 1172.6.  He claims the trial court failed to act as an independent factfinder and applied the wrong burden of proof at the evidentiary hearing.  He further argues the error was structural and therefore reversible per se.  We conclude defendant fails to demonstrate that the court misunderstood its role or applied an incorrect standard of proof.  We further conclude any assumed error was not structural, and that defendant forfeited any claim that the assumed error was prejudicial.  Accordingly, we affirm the denial of resentencing relief.

1

## A. Prior Appeal

We draw the following facts from the unpublished opinion and record in the prior appeal (*People v. Torres* (Dec. 16, 2014, A136219, A136232)).[1]

An information charged defendant, Rudolfo Raymond Ortega, Jr., (Ortega), and Jesus Antonio Vidrio (Vidrio) with (1) murder (Pen. Code,[2] § 187, subd. (a); count 1); attempted murder (§§ 664/187, subd. (a); count 2); and assault with a semiautomatic firearm (§ 245, subd. (b); count 3). As to counts 1 and 2, the information alleged that defendant and Ortega each personally and intentionally discharged a firearm that proximately caused great bodily injury or death (§ 12022.53, subd. (d)) and that the offenses were committed for the benefit and at the direction of a criminal street gang (§ 186.22, subd. (b)(1)). As to count three, the information alleged that defendant and Ortega each personally used a firearm (§§ 12022.5, subds. (a), (d), 1192.7, subd. (c)). The fourth count charged Vidrio with evading an officer with willful disregard while driving (Veh. Code, § 2800.2, subd. (a)) and included a criminal street gang allegation (§ 186.22, subd. (b)(1)).

The information was based on events that occurred in March 2010, when Humberto Padilla (Padilla) and his mother's boyfriend went to Alex Guizar's grandmother's house so that Padilla and Guizar "could straighten out whatever differences they were having in school." Padilla did not go there intending to fight Guizar, but a fist fight ensued nonetheless. Some testimony was presented that Padilla was a Norteño gang associate, and that the fight was over Guizar having contact with members of the Sureño gang.

---

[1]     On October 4, 2024, we granted the People's request for judicial notice of the record in the prior appeal.

[2]     Further unspecified statutory references are to this code.

2

At around 6:30 p.m., Padilla and his friends, R.E. and K.W.,[3] stood outside a friend's house when two men wearing black clothing and beanies walked by. The men doubled back and walked up to R.E., who did not recognize them. The men "dapped" R.E.'s hand, and one asked, " 'Hey, you all Norte' ?" R.E. replied, "Yeah, Rocky Hill Posse." The two men then stepped back and each pulled out a handgun and fired. The shooters were aiming at Padilla and in his direction "[f]or the most part," and they "fired until their guns were just clicking when they pulled the trigger, with no bullets coming out." Padilla was shot in the upper left side of his back and his right buttock and died at the hospital from his wounds. Both bullets exited the body, and it was not possible to tell the caliber of the bullets that caused the wounds. R.E. suffered gunshot wounds to his pelvis and buttock but survived.

T.R., a resident of the neighborhood, testified that at about 7:40 p.m. on the day of the shooting, he heard gunshots and saw two men unloading two guns. According to T.R., "It looked like they were aimed, but it looked random." He could not see whom the men were firing at. They stopped shooting when it appeared "they didn't have any more bullets" and then started to run. T.R. followed the men and saw them get into the passenger side of a white car parked almost a block away.

Police officers located the white sedan traveling on the freeway. When the police activated their lights, the white sedan exited the freeway and a chase ensued before the sedan crashed. Three men fled from the vehicle but were eventually apprehended.

Inside the white sedan, police officers found a black ski mask near the front passenger doorjamb and a pair of black leather gloves on the front

---

[3]     Because victims R.E. and K.W. were minors at the time of the shooting, we identify them by their initials to protect their anonymity.

passenger floorboard. The officers found a pair of black baseball-style gloves, a .9mm bullet, a .9mm magazine loaded with four bullets, and a black t-shirt in the back seat. Gunshot residue was detected on both pairs of gloves. Ortega's DNA was on the leather gloves, and defendant's DNA was on the baseball-style gloves.

In the front yard of the residence where the white sedan had crashed, police found a magazine for a .9mm Taurus handgun with 12 rounds in it. They also collected an unloaded .9mm semiautomatic pistol in a street gutter along the route of the pursuit. Multiple shell casings were found near an apartment building where the shooting took place including six .45-caliber casings and ten .9mm casings. At trial, an expert in ballistics and crime scene analysis testified that the .9mm cartridge casings found at the crime scene were fired from the Taurus .9mm pistol.

There were six bullet holes to the apartment building and one bullet hole to the front grill of a nearby vehicle. One of the bullet holes to the apartment building and the hole in the vehicle appeared to have been caused by a .9mm bullet because .9mm jackets were found beneath the holes. A police officer testified that these holes would not have been caused by someone shooting into the air.

Defendant took the stand and testified as follows. He had never been in a gang but had grown up in an area with gang members and knew Ortega was a member of the Sureño gang. On the day of the shooting, Ortega asked defendant if he would go with him to Vacaville to pick up his cousin, Guizar. Defendant did not know Guizar but agreed to go. Vidrio drove them to Vacaville and circled an apartment complex a few times without seeing anyone while Ortega tried to call Guizar. Defendant suggested they go home but Ortega told Vidrio to stop the car, and defendant and Ortega got out.

4

They saw a group of people, and defendant was a little scared and walked back a little bit. Someone asked, "Where the fuck are you guys from?" Defendant thought that Ortega said, "Bay Area," and that one of the others said, "Rocky Hill Posse."

One of the men came toward them with his hand inside his sweater. When the man pulled his hand out, defendant thought he was going to pull out a gun, so defendant turned and began to run. He heard a gunshot, pulled out his gun, and shot as he ran. Defendant tried to shoot in the air because he "didn't want to hit nobody," and he thought if he fired his gun, the others would get scared and stop firing. He ran to the car and Vidrio drove off. Defendant threw his gun out the window because he was scared and did not want to get caught with it. He was carrying a gun for safety because he had recently been jumped, robbed at gunpoint, and shot at by gang members. He identified the .9mm gun as belonging to him.

The jury acquitted defendant and Ortega of first degree murder but found them guilty of second degree murder, attempted murder, and assault with a firearm. The jury also found the firearm use allegations on counts one, two, and three to be true, but the gang allegations to be untrue. Vidrio was convicted under count four of evading an officer with willful disregard while driving. Defendant and Ortega were each sentenced to a total determinate term of 21 years and four months and a total indeterminate term of 65 years to life.

In December 2014, this division affirmed the judgment in an unpublished opinion. (*People v. Torres* (Dec. 16, 2014, A136219, A136232).)

**B. Resentencing Proceedings**

In September 2022, defendant filed a petition under former section 1170.95 seeking resentencing on the second degree murder conviction. In the

5

form petition, defendant checked boxes indicating he had been prosecuted under a theory of felony murder; murder/attempted under the natural and probable consequences doctrine; or another theory in which malice was imputed to him based solely on his participation in a crime, and that he could not presently be convicted of murder or attempted murder because of amendments to sections 188 and 189 that became effective on January 1, 2019.

In response to the petition, the People's briefing argued that defendant was ineligible for resentencing as a matter of law because he was convicted as the actual killer of Padilla and not under a theory of felony murder or the natural and probable consequences doctrine. However, at the initial hearing on the petition in February 2023, the prosecutor apparently acknowledged that defendant had established a prima facie case for relief. The trial court agreed and found "[t]here's enough to make a prima facie showing and set an evidentiary hearing."

Several months later, the People asked the trial court to reconsider the prima facie finding, arguing that although the issue had previously been "conceded," a review of the applicable law and facts led the People "to move this Court to reconsider their concession and the Court's subsequent finding based thereon."

At a hearing in November 2023, the trial court first heard arguments on the People's motion for reconsideration. The court "decline[d] to revisit" the prima facie finding and proceeded to the evidentiary hearing on the petition. Defense counsel Maas then offered the following arguments. First, there was no evidence defendant fired the shots that killed Padilla, and second, the prosecutor's arguments allowed the jury to convict defendant of second degree murder based upon evidence that he just "did a bunch of bad

6

things" and "fired a bunch of rounds in a very dangerous manner." Additionally, Maas contended the jury instruction defining implied malice "contained natural and probable consequences as a doctrine." Maas further argued that under *People v. Offley* (2020) 48 Cal.App.5th 588 (*Offley*), the jury's true enhancement finding under section 12022.5, subdivision (d), established only that defendant's discharge of a firearm was a proximate cause of Padilla's death, not that he "intentionally caused a death."

In December 2023, defendant testified at a continued hearing that he never intended to retaliate against anyone, and that he did not aim towards any of the victims. Following the direct examination, the trial court remarked that because the jury had acquitted defendant of first degree murder, "I get the idea that the record does not establish planning, premeditation. . . . [¶] So it's an interesting thing that the jury did what they did. . . . I'm operating off the premise that I'm deferring to the jury and they had doubt about premeditation, so I'm assuming they didn't plan to kill anybody before." The prosecutor responded that defendant's premeditation "wasn't proven beyond a reasonable doubt."

On cross-examination, defendant testified that the victims had approached him and Ortega, and that he had turned around to walk away when he heard a gunshot. He claimed he shot up into the air, not in the direction of anyone, because when he "heard the gunshot I believed that one of these guys was shooting at me, so I shot in the air believing that when they heard another gunshot they would stop shooting and it would make them run." He further explained, "I didn't find out until later on it was Ortega [who] shot his gun. I had my back towards him when I shot my gun, that's what I believed, I was trying to stop one of those guys that were shooting at me."

7

After redirect, the trial court heard arguments from both sides. Maas argued that "what the jury found before is actually not relevant anymore after a prima facie finding. . . . [Y]ou cannot inquire into the jury deliberations." The trial court responded, "Right, you cannot inquire into their deliberations, but they, in fact, when they render a verdict, just as I would defer to the jury as to the finding on first degree. . . . I'm not comfortable coming in and saying, based on my assessment, well, I think it should have been a first. . . . I think you have to defer . . . I think jeopardy attaches so I don't think I can do that anyway."

The trial court further remarked that the jury's true enhancement for defendant's firearm use "looms large," but Maas insisted the finding was not dispositive of defendant's malice "[b]ecause the Prosecutor got up and her theory was, basically, [defendant] doesn't have to be a good shot. He can be guilty of murder if he does something dangerous." Maas again cited the jury instruction for implied malice under CALCRIM no. 520, arguing that the jury was told "one of the theories [upon which] they could find implied malice was the natural and probable consequences doctrine." The prosecutor promptly objected, arguing that CALCRIM no. 520 is "not the natural and probable consequences doctrine"; that "[t]hose are completely different issues"; and that "[t]he language which uses the phrase natural and probable consequences in 520 is still valid today."

Defense counsel then argued that defendant could still be entitled to resentencing even if he was a proximate cause of Padilla's death, particularly when the prosecutor "argues he fired some shots towards some guys and . . . all else you can say is a couple of the bullets that you found didn't have the matching weight or diameter of the 45 caliber which is what Mr. Ortega used. [¶] So when this evidence is presented and it's argued to the jury that they

8

don't even need to find he's a good shot, if he did something dangerous, then he's guilty of Second Degree Murder and I think that's the argument that she made."

The trial court asked, "But if that's the case wouldn't [the jurors] have found him guilty of second and found not true the enhancement and the—this jury did not struggle finding things not true." "[A]gain, the first and the gang enhancements they found not true. So it seems to me . . . they vetted the evidence and weren't rolling over for the DA here." Maas responded that based on the record, "it's pretty impossible to understand even what the prosecution, the government that's holding this gentleman in prison for life, what he did do that amounted to enough to be guilty of a Second Degree Murder of the victim in this case, Mr. Padilla? . . . . I believe sitting here today that this record . . . doesn't prove beyond a reasonable doubt that he should be held responsible for the murder of Mr. Padilla."

The prosecutor asked the trial court if it had reviewed the trial testimony of other witnesses, including T.R., the neighbor who had witnessed the shooting. The court responded, "Sometime ago we went back through the trial. It was, like, months and months ago." The prosecutor reminded the court that not only did K.W. testify that both defendant and Ortega " 'emptied their clips at us,' " but T.R. likewise testified that " 'there was two people standing there just unloading a couple of guns,' " and that " '[i]t looked like they were aimed, but it looked random.' " Based on this testimony, the prosecutor argued that the court should reject defendant's self-serving testimony that he fired into the air. The prosecutor further suggested that the jury's true enhancement finding was "indicative of the intent of" defendant, and moreover, it is "hard to believe how . . . the attempted murder

9

as to [R.E.] could be true if [defendant] was firing up in the air as he indicated."

At the close of the hearing, the trial court announced its decision to deny the petition for resentencing on the second degree murder conviction. As the court explained, "the 12022.53 finding is kind of logically dispositive and factually dispositive. [¶] I—I agree we do have to do a review of the evidence, but there were witnesses with no apparent obvious bias in terms of describing what they saw, describing both gentlemen [as] shooting and no one corroborating the story of shooting up in the air which is why I think the jury made the finding that they did." "I understand why [defendant] wants to believe that, but I can't find it credible in the face of what in fact, did happen here, and what was seen and what was testified to by these witnesses." The court concluded, "I don't think anything is changed in the presentation of the evidence or in the record that would cause me to disturb those findings that have previously been made. And I had—had been asked to do so, and I would probably make those same findings." This appeal followed.

## DISCUSSION

Defendant contends the trial court applied the wrong standard of proof in denying his section 1172.6 petition. In defendant's view, the court did not act as an independent factfinder to determine whether the prosecution had proven beyond a reasonable doubt that defendant could be convicted of murder under current law, but rather, applied a more lenient substantial evidence test in deference to the jury's findings. As we shall explain, we are satisfied that the court understood and fulfilled its role as an independent factfinder and applied the correct standard of proof. We further conclude that any assumed error was harmless.

### A. Governing Law

Prior to the effective date of Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Stats. 2018, ch. 1015; Senate Bill No. 1437), malice could be imputed to a person who did not personally harbor it who under two theories:  (1) the felony murder rule, and (2) the natural and probable consequences doctrine. Under the felony murder rule, a defendant could be liable for first or second degree murder if the defendant or an accomplice killed someone during the commission or attempted commission of an inherently dangerous felony. (*People v. Powell* (2018) 5 Cal.5th 921, 942.)  Under the natural and probable consequences doctrine, an aider and abettor could be found "guilty not only of the intended, or target, crime but also of any other crime a principal in the target crime actually commits (the nontarget crime) that is a natural and probable consequence of the target crime." (*People v. Smith* (2014) 60 Cal.4th 603, 611.)

Senate Bill No. 1437 amended the statutes defining malice (§ 188) and felony murder (§ 189, subd. (e)) to "eliminate[] natural and probable consequences liability for murder as it applies to aiding and abetting, and limit[] the scope of the felony-murder rule." (*People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*).)  It also added former section 1170.95, "which creates a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*Lewis*, at p. 957.)  Effective January 1, 2022, Senate Bill No. 775 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 551, § 2; "Senate Bill No. 775") amended section 1170.95 to extend the resentencing procedures to a person convicted under any "other theory under which malice is imputed to a person based solely on that person's participation in a crime."  Former section 1170.95 has since been renumbered as section 1172.6, with no substantive changes.  (Stats. 2022, ch. 58, § 10.)

If a section 1172.6 petition contains all required information (e.g., declaration of eligibility, case information, any request for appointed counsel), the trial court "must 'review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of [section 1172.6].' [Citation.] If the petitioner has made this initial prima facie showing, he or she is entitled to appointed counsel, if requested, and the prosecutor must file a response, and the petitioner may file a reply. [Citation.] The court then reviews the petition a second time. If it concludes in light of this briefing that the petitioner has made a prima facie showing of entitlement to relief, it must issue an order to show cause and hold an evidentiary hearing to determine whether to vacate the murder conviction and recall the sentence and resentence the petitioner on any remaining counts." (*People v. Roldan* (2020) 56 Cal.App.5th 997, 1003.) The prosecutor and the petitioner may offer "new or additional" evidence at the evidentiary hearing. (§ 1172.6, subd. (d)(3).)

**B. Standard of Proof**

We begin with the general principle that "[a]bsent evidence to the contrary, we presume that the trial court knew and applied the governing law." (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1390.) Here, the governing statute explicitly provides that on a petition for resentencing, the prosecution must "prove, beyond a reasonable doubt, that the petitioner is guilty of murder under current law." (§ 1172.6, subd. (d)(3).) The statute also makes clear that "[a] finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (*Ibid*.)

12

Nothing in the record affirmatively suggests the trial court misapplied the standard of proof or mistook its role in the manner urged by defendant. In the briefing and arguments below, defendant's counsel repeatedly argued that the trial court's role was to determine whether defendant could be guilty of murder beyond a reasonable doubt under existing law. The prosecutor did not argue to the contrary, and neither side suggested that the court was tasked with simply determining whether substantial evidence supported the jury's findings. Although the court did not explicitly state the prosecution had proven beyond a reasonable doubt that defendant could be convicted of murder under a currently valid theory, section 1172.6 did not require the court to make express findings or state the standard it employed.

Defendant nevertheless insists that various remarks by the trial court revealed its confusion over its role and the appropriate standard of proof. For instance, defendant cites the court's statement that it " 'would defer to the jury' on whether the offense was first or second degree murder." Defendant also highlights the court's remarks that the trial testimony of the eyewitnesses was "why I think the jury made the finding that they did"; that the court saw nothing in the evidence or record "that would cause me to disturb those findings that have previously been made"; and that the court "would probably make those same findings" "had I . . . been asked to do so." We are not convinced that these statements, when read in context, demonstrate the court's error.

The trial court's remark that it would defer to the jury's acquittal of defendant on the first degree murder charge aligned with existing case law holding that a court cannot deny resentencing based on new findings that turn a jury's " ' "acquittals and not-true enhancement findings [at trial] into their opposites." ' " (*People v. Arnold* (2023) 93 Cal.App.5th 376 [resentencing

13

court erred in failing to give preclusive effect to jury's not-true finding on knife-use enhancement]; see *People v. Henley* (2022) 85 Cal.App.5th 1003 [error in finding defendant was armed during robbery in support of major participant finding, as jury made opposite finding at trial]; *People v. Cooper* (2022) 77 Cal.App.5th 393 [same re court's findings that defendant possessed and fired gun during kidnapping].) Although defendant emphasizes the People's apparent disagreement with these decisions, the cases remain good law. The trial court's remark—consistent with published appellate case law—that it would give effect to the jury's acquittal on the first degree murder charge does not demonstrate the court's failure to act as an independent factfinder on matters material to resentencing of the second degree murder charge.

As for the trial court's other remarks about not disturbing the jury's findings related to defendant's firearm use, we acknowledge the statements on their face could be viewed as applying a deferential standard of review. However, when read in context, it reasonably appears the court was emphasizing the *strength* of the incriminating evidence that supported defendant's role in the shooting, and thus, his culpability for murder under current law. As the court noted, the eyewitnesses to the shooting had "no apparent obvious bias in terms of describing what they saw," and "no one corroborat[ed] the story of the shooting up in the air which is why I think the jury made the finding that it did." The court also remarked that despite defendant's self-serving testimony, the court could not "find it credible in the face of what, in fact, did happen here, and what was seen and what was testified to by these other witnesses." Meanwhile, the court acknowledged it "went back through the trial" record, which included evidence that the .9mm firearm recovered at the scene belonged to defendant, and that police found

14

.9mm bullet holes in the apartment building and the grill of a nearby vehicle, which would not have been caused by someone firing into the air. Defendant cites no authority that prohibited the trial court from considering the evidence underlying the true enhancement finding and the logical inferences to be drawn therefrom, in conjunction with other evidence of defendant's intent, in drawing its conclusion that defendant was not entitled to resentencing under section 1172.6.

In sum, we are satisfied that the trial court properly understood and performed its role of independently considering and weighing the evidence to determine that defendant could, beyond a reasonable doubt, be convicted of murder under current law. (§ 1172.6, subd. (d)(3).)

**C. Prejudice**

Even assuming for the sake of argument that the trial court applied an incorrect standard of proof at the evidentiary hearing, we conclude the purported error was harmless.

As a threshold matter, defendant claims the purported error was structural and therefore subject to automatic reversal. The weight of authority holds otherwise, and we join those decisions holding that application of the wrong standard of proof at a section 1172.6 resentencing hearing is not structural error.

" 'Structural defects requiring automatic reversal of a criminal conviction typically involve basic protections without which " 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.' " [Citations.] These include total deprivation of the right to counsel, denial of the right of self-representation, trial before a judge who is not impartial, unlawful exclusion of members of the defendant's race from a

15

grand jury, and denial of the right to a public trial.' " (*People v. Garrison* (2021) 73 Cal.App.5th 735, 745–746 (*Garrison*).) "An error is ' "structural," and thus subject to automatic reversal, only in a "very limited class of cases," ' such as the complete denial of counsel, a biased decision maker, racial discrimination in jury selection, denial of self-representation at trial, denial of a public trial, and a defective reasonable-doubt instruction. [Citation.] What unites this class of errors is 'a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." ' " (*People v. Mil* (2012) 53 Cal.4th 400, 410.)

In *Garrison*, the appellate court concluded the concept of structural error does not apply to a resentencing hearing under former section 1170.95 because the hearing is not a criminal trial, and thus, the purported application of an incorrect standard of proof during resentencing does not affect the framework of a trial. (*Garrison*, *supra*, 73 Cal.App.5th at pp. 746–747; see *also People v. Garcia* (2022) 82 Cal.App.5th 956, 972, fn. 9 (*Garcia*).) However, *Garrison* did not decide whether the applicable test for prejudice was the federal constitutional standard of *Chapman v. California* (1967) 386 U.S. 18, 24 or the test of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), finding the error harmless under either standard. (*Garrison*, at p. 747.)

In *People v. Vance* (2023) 94 Cal.App.5th 706 (*Vance*), the court adopted the reasoning of *Garrison* and held that a trial court's application of the incorrect burden at an evidentiary hearing under section 1172.6 was not structural error. (*Vance*, at pp. 715–716.) *Vance* further held that the *Watson* harmless error test applied. As the court explained, because a petition under section 1172.6 is not a criminal prosecution, most of the federal protections that attend a criminal conviction (e.g., right against double jeopardy, right against self-incrimination, right to trial by jury) do not

16

apply. (*Vance*, at p. 716.) And because the requirement of proof beyond a reasonable doubt in resentencing proceedings under section 1172.6 is merely a statutory right provided by the Legislature, "a violation of the right is subject to the state law harmless error standard." (*Vance*, at pp. 716–717; accord, *People v. Rodriguez* (2024) 103 Cal.App.5th 451, 459 ["Even if the trial court erred in describing its role or applying the burden of proof, the error was harmless because it is not reasonably probable that absent the error appellant would have achieved a more favorable result."].)

Defendant does not contend these decisions were wrongly decided. Instead, he relies primarily on the disposition in *People v. Frierson* (2017) 4 Cal.5th 225 (*Frierson*), which reversed the trial court's application of a preponderance-of-the-evidence standard in a resentencing proceeding under the Three Strikes Reform Act of 2012 and remanded for further proceedings. However, *Frierson* did not address the concept of structural error and therefore it is not authority for the proposition urged by defendant. (*People v. Baker* (2021) 10 Cal.5th 1044, 1109; see *Garrison*, *supra*, 73 Cal.App.5th at p. 747, fn. 7 [declining to rely on *Frierson* as authority on structural error in resentencing proceedings].) Furthermore, remand was necessary in *Frierson* for reasons unique to the resentencing statute in that case. On remand, the trial court had to decide not only whether the prosecution had proven the petitioner's ineligibility for relief beyond a reasonable doubt, but even if it had not, whether the court should nonetheless exercise its "broader discretion" under the " 'escape valve' " provision of the Three Strikes Reform Act of 2012 to deny resentencing on the ground that the petitioner posed an unreasonable risk of danger to the public. (*Frierson*, at pp. 238–240.) For these reasons, we are not persuaded that *Frierson* supports the conclusion

17

that a burden of proof error in a resentencing proceeding under section 1172.6 is structural.

Defendant's remaining authorities are likewise inapplicable, as they pertain to structural errors that occurred during criminal and civil trials, not a resentencing hearing under section 1172.6. (See *Sullivan v. Louisiana* (1993) 508 U.S. 275 [erroneous jury instruction on reasonable doubt standard]; *People v. Blackburn* (2015) 61 Cal.4th 1113 [invalid jury trial waiver in mentally disordered offender proceeding]; *Severson & Werson, P.C. v. Sepehry-Fard* (2019) 37 Cal.App.5th 938 [workplace violence restraining order issued without jurisdictional statutory notice to restrained party]; *People v. Nicolas* (2017) 8 Cal.App.5th 1165 [erroneous jury instruction lowered standard of proof]; *People v. Cruz* (2016) 2 Cal.App.5th 1178 [same].)

In light of the foregoing, we conclude that the assumed error in this case was not structural and that it is subject to the *Watson* harmless error analysis. (*Vance, supra*, 94 Cal.App.5th at pp. 716–717; *Garrison, supra*, 73 Cal.App.5th at pp. 746–747.) Critically, as was the case in *Vance*, defendant "has staked all of his chips on the proposition that reversal is automatic" and "does not argue that *even if* reversal is not automatic, the error was prejudicial." (*Vance*, at p. 717.) He does not address the substance of the People's argument that any purported error in applying the standard of proof was harmless because defendant was ineligible for resentencing as a matter of law.[4] (See *Garrison, supra*, 73 Cal.App.5th at p. 745 [no prejudice in resentencing court's application of wrong standard of proof at evidentiary hearing because defendant was ineligible for relief as a matter of law].)

---

[4]     Instead, defendant merely contends the prosecution procedurally forfeited the eligibility question at the prima facie stage of the proceedings. But defendant does not address the merits of the eligibility question in the context of the People's harmless error argument.

18

Nor does defendant renew any of the contentions defense counsel raised at the resentencing hearing below—e.g., that (1) defendant was convicted of murder under the natural and probable consequences doctrine or some other theory of imputed malice; (2) the jury was given an instruction for implied malice under CALCRIM no. 520 that incorporated the invalidated natural and probable consequences doctrine or otherwise permitted the jury to impute malice to defendant merely from his participation in a crime; and (3) the trial court could not deny resentencing based on the true enhancement finding because that finding did not establish defendant's malice (see *Offley*, *supra*, 48 Cal.App.5th at pp. 593, 599). Because defendant had the burden of showing prejudice and has not done so, he "has forfeited any claim that the trial court's application of an erroneous burden of proof was prejudicial." (*Vance*, *supra*, 94 Cal.App.5th at p. 717.)

Moreover, and in any event, the above contentions lack merit, as defendant was not convicted of murder under the natural and probable consequences doctrine or any other theory of imputed malice; the implied malice instruction did not incorporate the natural and probable consequences doctrine or otherwise permit the jury to impute malice to defendant based on his mere participation in a crime (see *Garcia*, *supra*, 82 Cal.App.5th at p. 972, fn. 10); and no other instruction incorporating the natural and probable consequences doctrine such as the conspiracy instruction in *Offley*, *supra*, 48 Cal.App.5th at pp. 593, 599, was given in this case. As recounted in our factual background, the evidence in the record showed that defendant and Ortega—who were each armed with guns and multiple clips of ammunition, dressed in black, and wearing gloves—approached Padilla and his friends and opened fire on them, aiming "[f]or the most part" at Padilla, who had just been in a fight with Ortega's cousin. They "fired until their guns were just

19

clicking when they pulled the trigger, with no bullets coming out." Based on the number of casings found at the scene, defendant fired his .9mm weapon 10 times, and Ortega fired 6 times. They then ran to a waiting getaway car and fled from police, dumping a gun along the way. Though it could not be determined whose bullet caused Padilla's death, the law provides that when multiple shooters concurrently engage in gunfire and a victim is killed by a single bullet, each shooter may be liable for murder even though the evidence does not establish who fired the fatal shot. (*People v. Bland* (2002) 28 Cal.4th 313, 337; *People v. Sanchez* (2001) 26 Cal.4th 834, 845; *People v. Lopez* (2021) 73 Cal.App.5th 327, 333.) Senate Bill No. 1437 did not impact this theory of substantial concurrent causation. (*People v. Carney* (2023) 14 Cal.5th 1130, 1145–1147.) Because there was strong evidence supporting a finding beyond a reasonable doubt that defendant either expressly intended to kill Padilla, or that he deliberately and with conscious disregard for human life performed an act that was dangerous to human life—and because the evidence fails to support a contrary finding—we see no reasonable probability that defendant would have obtained a more favorable result absent any assumed error by the trial court.

## DISPOSITION

The order denying the petition for resentencing is affirmed.

20

_____
Fujisaki, J.

WE CONCUR:

_____
Tucher, P. J.


_____
Petrou, J.


*People v. Torres* (A169539)